MJF:DDB
F.#2007R00828

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**M-09-1221**

- - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA

      - against -

STEVEN WASHINGTON,

      Defendant.

AFFIDAVIT IN SUPPORT
OF APPLICATION FOR
ARREST WARRANT

(T. 18, U.S.C., § 1344)

- - - - - - - - - - - - - - - - - - -x

EASTERN DISTRICT OF NEW YORK, SS:

      JENNIFER ADAMS, being duly sworn, deposes and states that she is a Confidential Investigator with the New York City Department of Investigation ("DOI"), duly appointed according to law and acting as such.

      Upon information and belief, there is probable cause to believe that in or about and between October 2005 and March 2008, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant STEVEN WASHINGTON, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud financial institutions, to wit: J.P. Morgan Chase and Citibank, and to obtain moneys, funds, credits, assets and other property owned by, and under the custody and control of these financial institutions by means of materially false and fraudulent pretenses, representations and promises, in violation of Title

18, United States Code, Section 1344.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

The source of your deponent's information and the grounds for her belief are as follows:

1. I have been a Confidential Investigator with DOI assigned to the Inspector General's office responsible for overseeing the New York City Department of Finance ("DOF") for over three years. I have conducted investigations and have been involved in making arrests relating to, among other things, fraud against the government, false statements, and bribery. My current responsibilities include the detection and investigation of fraud against New York City (the "City").

2. The facts set forth in this affidavit were developed as a result of an independent investigation conducted by myself and other law enforcement officers, interviews of witnesses and the review and analysis of documents and records relating to the case.

3. Because the purpose of this affidavit is limited to setting forth probable cause to arrest, I have not set forth every fact of which I am aware pertaining to this investigation. Where I relate statements, conversations, and actions of others, those statements, conversations, and actions of others are related in substance and in part, except where otherwise

indicated. Where I state that an individual is an employee or official of a business or governmental agency, that individual was an employee or official at the time of the offense.

The Investigation

   4. In January 2007, DOI initiated an investigation after receiving information from DOF and the City Office of the Comptroller (the "Comptroller's Office") that numerous City vendor payment checks had been either counterfeited or altered, and then negotiated, by individuals other than the intended recipients.[1] These vendor checks were legitimately issued by DOF and the Comptroller's Office, acting jointly, to various vendors who had provided goods and services to the City.[2] The City vendor checks in question were apparently either counterfeited or altered after they had been issued by the City but before they were received by the intended vendor/payee.

   5. During the course of this investigation, officials from the Comptroller's Office have determined that approximately twenty-two vendor payment checks issued to legitimate City

---

[1] By "counterfeit" I am referring to a forged check created from information derived from a legitimately issued City check. By "altered" I am referring to a legitimate City check that was physically changed on its face in some manner, often by replacing the intended vendor/payee with the name of an individual participating in this illegal scheme.

[2] Under City regulations, every check issued by the City for payment to a vendor must first be signed by an official from the DOF and an official from the Comptroller's Office, before it can be negotiated by the listed payee on that check.

vendors were stolen and then either altered, or counterfeited, or both. These checks, and/or the information thereon, were ultimately used to create a total of sixty-six altered or counterfeit checks (collectively the "Fraudulent Checks"). These Fraudulent Checks were then deposited into banks within the Eastern District of New York and elsewhere. The total face value of the Fraudulent Checks was in excess of $2.7 million dollars. According to bank records, participants in this scheme have unlawfully obtained over $600,000 from the Fraudulent Checks.

The Administration for Children Services

6. The City Administration for Children's Services ("ACS") is an agency that provides social services and other programs to protect and insure the well being of City children and families. ACS contracts with various private vendors to assist them in providing services. Vendors providing goods and services to any City agency, including ACS, are paid by a check issued by the DOF/Comptroller's Office. In the usual course of business, once the DOF/Comptroller's Office issued a vendor check for work performed for ACS, an employee of ACS would pick up the check at DOF's offices and deliver it to the ACS office at 150 William Street, New York, New York (the "ACS Office"), where, upon information and belief, said checks were stored in a locked safe. Officials from the Comptroller's Office informed me that all of the legitimate vendor payment checks that were used to

5

create the Fraudulent Checks were issued to City vendors in compensation for services provided to ACS.

7.   I have been informed by ACS officials that an individual whose identity is known to me, hereinafter referred to as co-conspirator 1 ("CC-1"), has been employed by ACS as a Principal Administrative Associate for approximately four years, starting in 2004.  During the relevant time period, CC-1's responsibilities with ACS included mailing out vendor payment checks such as the checks that were altered and counterfeited in this investigation.  According to ACS officials interviewed during the course of this investigation, due to CC-1's position and job responsibilities within ACS, CC-1 had access to the safe where the vendor payment checks were maintained.

Information Provided by a Confidential Informant

8.   I have spoken with a confidential informant ("CI-1") on numerous occasions.[3]  CI-1 is a participant in the above-referenced counterfeit check scheme and described the scheme as follows.  From 2005 until March 2008, CC-1 provided ACS vendor payment checks to CI-1 and others, who in turn would either counterfeit or alter them and then give them to other participants in the scheme, who would "recruit" individuals to

---

[3]   On March 13, 2008, CI-1 was arrested by state authorities on unrelated charges.  CI-1 has signed a cooperation agreement with the Eastern District of New York arising out of CI-1's involvement in the criminal scheme referenced herein and is expected to plead guilty in the near future.

6

open accounts at various banks located mainly in Brooklyn and Queens, New York, into which the Fraudulent Checks would be deposited. After the Fraudulent Checks cleared, CI-1 and others would make withdrawals from the various accounts and each participant in the scheme would receive a portion of the funds withdrawn. According to my investigation, there were at least 60 participants involved in this scheme.

9. For instance, CI-1 informed me that on several occasions, CI-1 met CC-1 near the ACS Office and was given City vendor checks CC-1 had stolen from ACS. In some instances, CI-1 would alter the checks obtained from CC-1 by replacing the vendor/payee name on the check with the name of the scheme participant into whose account the altered check was to be deposited. CI-1 also advised me that, on several occasions, CI-1 would deposit the altered checks into the scheme participant's account by using the account holder's ATM card.

10. On other occasions, CC-1 instructed CI-1 to photocopy the vendor checks and then immediately return them to CC-1. CC-1 informed CI-1 that these checks had to be returned to ACS and mailed to the intended City vendor in order to avoid the possibility that CC-1's role in the scheme would be detected. On those occasions, CI-1 would make a counterfeit check by using some of the information on the original check -- often a portion of the legitimate check number and the correct date -- but the

counterfeit check would be made payable to one of the scheme participants, and then either CI-1 or another scheme participant would deposit the check into an account the co-conspirators controlled.

    11. I have been informed by CI-1 that, as a part of this scheme, the following Fraudulent Checks, among other, were altered or counterfeited based on City checks provided by CC-1 and deposited into banks within the Eastern District of New York, and that a portion of the funds deposited were subsequently withdrawn.

Check 1

    12. An employee at J.P. Morgan Chase ("Chase") informed me that a check in the amount of $4,780.75 ("Check 1") was deposited on February 8, 2007, at a Chase branch located in Brooklyn, New York, into an account ("Chase Account") maintained by a confidential informant whose identity is known to DOI ("CI-2").[4] I have interviewed CI-2, a participant in the counterfeit-check scheme, on numerous occasions. CI-2 advised me that defendant STEVEN WASHINGTON offered CI-2 cash in exchange for CI-2 opening an account at Chase, and relinquishing control of that account to WASHINGTON. In February 2007, CI-2 opened the Chase Account as directed and immediately gave WASHINGTON the ATM cards

---

[4] CI-2 was arrested on July 18, 2007 on charges related to CI-2's participation in this scheme and has agreed to cooperate with this investigation.

8

and all documents the bank had provided CI-2 regarding the account. Within a few days of CI-2 opening the Chase Account at WASHINGTON's direction, WASHINGTON took CI-2 to three different Chase branches and instructed CI-2 to withdraw various sums of money from the account. CI-2 did as directed and surrendered the money withdrawn to WASHINGTON, who in turn gave CI-2 $500 for each of the three withdrawals, for a total of $1500.

13. According to officials at the Comptroller's Office, the legitimate check that correlates to Check 1 had originally been issued by DOF/Comptroller's Office on December 13, 2006, to a company named Spherion Atlantic Enterprises ("Spherion") in the amount of $16,574.25, under check number 0155931399. A portion of this check number also appears on the fraudulent check. I spoke with an employee of Spherion who informed me that they had performed services for ACS and confirmed that they were to be paid $16,574.25 for those services. I was further informed that no one with CI-2's name has ever been employed at Spherion and that CI-2 did not have permission or authority from Spherion to accept or deposit that check. I have also spoken to officials at DOF and the Comptroller's Office and was informed that CI-2 did not have permission or authority to create, alter or deposit any City check. According to officials from the Comptroller's Office and Spherion, Spherion did receive the original check issued to them

9

by the City.

14. I was informed by CI-1 that CI-1 received the original City check issued to Spherion from CC-1 and used some of the information contained on that same original City check to create counterfeit Check 1.[5] CI-1 also advised me that CI-1 deposited Check 1 into the Chase Account after endorsing it in CI-2's name.

Check 2

15. According to an employee of Citibank, on February 14, 2007, a check in the amount of $3,513.98 ("Check 2") was deposited into the account ("Citibank Account") of a confidential informant known to DOI ("CI-3") at a Citibank branch in Queens, New York.[6] I was informed by CI-3 that CI-3 was approached by defendant STEVEN WASHINGTON and told that if CI-3 opened an account at Citibank and allowed scheme participants access to that account, CI-3 would receive money. CI-3 informed me that CI-3 did as directed, and immediately gave WASHINGTON the ATM cards and all documents the bank had provided CI-3 regarding the account.

16. According to officials of the Comptroller's Office, on January 30, 2007, a check was issued to Verizon

---

[5] I have examined Check 1 by comparing it to the original City check and I have determined that Check 1 is in fact counterfeit.

[6] CI-3 was arrested on September 4, 2007 on charges related to CI-3's participation in this scheme.

10

Network Integration Corp. ("Verizon") in the amount of $310,513.98, under check number 0156013002, for services performed for ACS. Officials of the Comptroller's Office also informed me that Check 2 appears to be a fraudulent check, because for example, a portion of the real check number appears on the fraudulent check.[7]

17. I have been informed by an employee of Verizon that Verizon was owed $310,513.98 from the City for services rendered to ACS, but never received this payment. They also informed me that no one with CI-3's name works for Verizon, nor did anyone by that name have the permission or authority of Verizon to take or deposit this check. I have also spoken to officials at DOF and the Comptroller's Office and was informed that CI-3 did not have permission or authority to create, alter or deposit a City check.

18. I have been informed by CI-1 that CC-1, the corrupt ACS employee mentioned above, provided CI-1 with the original City check issued to Verizon. CI-1 indicated that CI-1 used some of the information on the original City check to create counterfeit Check 2, which CI-1 then deposited into the Citibank account after endorsing it in CI-3's name.

---

[7] I have examined Check 2 by comparing it to the original City check and I have determined that Check 2 is in fact counterfeit.

Identifying Washington On Bank Surveillance Photographs

19. With information that CI-2 and CI-3 provided to me regarding defendant STEVEN WASHINGTON, I was able to obtain a photograph of an individual named STEVEN WASHINGTON using various law enforcement databases. When I showed them a photographic array containing the photograph of STEVEN WASHINGTON from the databases, both CI-2 and CI-3 identified that photograph as accurately depicting the individual who recruited them to establish the bank accounts as described above. I have also reviewed surveillance photographs taken on February 15, 2007 at a Chase branch located in Queens, New York. The photographs show WASHINGTON at the ATM machines located there, and based on Chase records, February 15, 2007 is one of the days when there is activity in the Chase Account that WASHINGTON directed CI-2 to establish.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued so that the defendant STEVEN WASHINGTON may be dealt with according to law.

12

WHEREFORE, your deponent further respectfully requests that this affidavit be and remain sealed until further order of the Court.

*[signature]*
JENNIFER ADAMS
Confidential Investigator
New York City Department of
Investigation

Sworn to before me this
11th day of December, 2009